Jason M. Kerr (8222)
Steven Garff (13707)
**PRICE, PARKINSON & KERR**
5742 W. Harold Gatty Drive
Salt Lake City, UT 84116
Telephone: (801) 517-7088
E-mail: jasonkerr@ppktrial.com
          stevengarff@ppktrial.com

*Attorneys for JLPR, LLC*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| JLPR, LLC, a Utah limited liability company; | **COMPLAINT AND JURY DEMAND** |
| Plaintiff | Case No. 2:21-cv-00436 |
| v. | District Judge: Ted Stewart |
| Utah Department of Agriculture and food, Utah Division of Purchasing, General Services, The State of Utah, Scott Ericson, Kerry Gibson, Kelly Pehrson, Andrew Rigby, Cody James, Natalie Callahan, Mellissa Ure, Brandy Grace, Christopher W. Hughes, Mark Anderson, Zac Christensen, Stephanie Casta, Standard Wellness Utah, LLC, and True North of Utah, LLC. | |
| Defendants. | |

---

Plaintiff JLPR, LLC ("JLPR" or "Plaintiff") through the undersigned counsel, sues the

Utah Department of Agriculture and Food ("DAF"), the Utah Division of Purchasing and

General Services, the State of Utah, Scott Ericson, Kerry Gibson, Kelly Pehrson, Andrew Rigby,

Cody James, Natalie Callahan, Mellissa Ure, Brandy Grace, Christopher W. Hughes, Mark

Anderson, Zac Christensen, Stephanie Casta, Standard Wellness Utah, LLC, and  True North of Utah, LLC.

## **INTRODUCTION**

In 2018 Utah voters approved the Utah Medical Cannabis Act, AKA "Proposition 2." The law, as later revised by the State Legislature, provided for "the cultivation, processing, medical recommendation, and patient use of medical cannabis" within the State of Utah.

Unlike some states in which there are an unlimited number of cultivation licenses or a large number of cultivation licenses, the Utah Legislature chose to strictly limit the number of available licenses to ten (later changed to eight).  This limitation has made these licenses extremely valuable.  Indeed, on information and belief, at least one cultivation license recipient quickly turned around and sold its company for millions of dollars after obtaining a license.

In June of 2019, the State of Utah opened up an application process for licenses to cultivate medical marijuana within the state of Utah (Solicitation #DB199063).

Plaintiff JLPR timely applied for a license to cultivate medical cannabis in the state. However, due to a variety of improper conflicts of interest, scoring irregularities, scoring collusion among evaluators, alteration of evaluators' scores to align with senior management's favored companies, biases, failures to follow the law, and other failures of the DAF (as will be detailed more fully below), JLPR was not awarded a cultivation license.

JLPR timely appealed the DAF's denial of a Cultivator License to a DAF Protest Officer, who denied the protest, and then to the Procurement Board of the Utah Division of Purchasing and General Services who also denied JLPR's appeal.  The Procurement Board's decision is extremely sparse.  The entire discussion of the merits of the appeal consists of only two single short paragraphs and concludes, without support or discussion, that "JLPR failed to provide any

facts or evidence in support of its claims" and accepting the Protest Officer's decision that he "found no evidence of the evaluation committee violating the Utah Procurement Code or failing to follow a provision of the Solicitation in its proceedings."

The Panel simply ignored the evidence and facts provided by JLPR.

The Panel's decision is especially troubling in light of the clear conflicts of interest that existed among multiple panel members, which will be detailed below.

After this denial, JLPR and its attorneys sought documents from the DAF through a GRAMA request. The DAF challenged this GRAMA request, providing some documents while withholding others. JLPR appealed this refusal and, after a formal settlement conference before the State Department of Records in which the DAF agreed to provide some additional documents, JLPR agreed to dismiss the remainder of this GRAMA appeal.

The documents which JLPR obtained through its GRAMA request and other investigations JLPR has undertaken further show widespread bias, conflicts, errors, failures to follow the law, and other problems with the evaluation process.

On November 17, 2020 the Office of the State Auditor published an audit of the DAF, including of the evaluation process used to select cannabis grower licenses (the "Audit" or "Report"). The stated purpose of this Audit was in response and to "asses the validity" of allegations that the Department failed to comply with the law, as have been raised by JLPR in its formal protest and appeal and this Complaint, as well as in the news media and elsewhere.

The State Auditor's Office "reviewed the scoring from the evaluation process used to award cannabis grower licenses for propriety and compliance with Utah Code" and "performed a statistical analysis designed to identify groupings among evaluation committee member scores."

This Audit found "Concerns Regarding UDAF Administration," and "weaknesses in UDAF's control environment" which the Auditor concluded "resulted in… Concerns regarding bid selection [and] Undisclosed conflicts of interest."

The Audit also noted "concerns about certain factors and conditions that call into question the independence of the process" of the evaluation.

The official Audit of DAF records details serious problems with the cannabis cultivation license evaluation scoring under the headers "Significant Score Correlation Could Indicate Lack of Scoring Independence" and "Significant Modifications to Scores Aligned with Senior Management Preferences."

The conflicts of interest, scoring problems, and failures to follow the law uncovered by the Audit during the evaluation process for cannabis cultivation licenses were so severe that the State Auditor's Office issued a formal recommendation that the UDAF "[r]eassess the licenses awarded."

This Audit confirmed and further detailed many of the serious problems with the license selection process and further demonstrates that JLPR was unlawfully denied a cultivation license.

## PARTIES

1. Plaintiff JLPR, LLC is a Utah Limited Liability Company with its principle place of business in the State of Utah.

2. Defendant the Utah Department of Agriculture is an agency of the State of Utah.

3. Defendant the Utah Division of Purchasing and General Services is an agency of the Sate of Utah.

4. Defendant the State of Utah is a state government.

5. Defendant Scott Ericson is an individual residing in the state of Utah who was at one time the Deputy Commissioner of the Department of Agriculture. Mr. Ericson conspired with the other Defendants, including state officials, to deprive JLPR of its federally protected rights.

6. Defendant Kerry Gibson is an individual residing in the state of Utah who was at all relevant times the Department Commissioner of the DAF. He is sued in his individual capacity.

7. Defendant Kelly Pehrson is an individual residing in the state of Utah who was at all relevant times a DAF Evaluation Committee member for Solicitation #DB199063. He is sued in his individual capacity.

8. Defendant Andrew Rigby is an individual residing in the state of Utah who was at all relevant times a DAF Evaluation Committee member and chair for Solicitation #DB199063. He is sued in his individual capacity.

9. Defendant Cody James is an individual residing in the state of Utah who was at all relevant times a DAF Evaluation Committee member for Solicitation #DB199063. He is sued in his individual capacity.

10. Defendant Natalie Callahan is an individual residing in the state of Utah who was at all relevant times a DAF Evaluation Committee member for Solicitation #DB199063. She is sued in her individual capacity.

11. Defendant Mellissa Ure is an individual residing in the state of Utah who was at all relevant times a DAF Evaluation Committee member for Solicitation #DB199063. She is sued in her individual capacity.

12. Defendant Brandy Grace is an individual residing in the state of Utah who was at all relevant times a DAF Evaluation Committee member for Solicitation #DB199063. She is sued in her individual capacity.

13. Defendant Christopher W. Hughes is an individual residing in the state of Utah who was at all relevant times a Protest Officer of Defendant DAF. He is sued in his individual capacity.

14. Defendant Mark Anderson is an individual residing in the state of Utah who was at all relevant times a Procurement Policy Board member of Defendant Utah Division of Purchasing and General Services. He is sued in his individual capacity.

15. Defendant Zac Christensen is an individual residing in the state of Utah who was at all relevant times a Procurement Policy Board member of Defendant Utah Division of Purchasing and General Services. He is sued in his individual capacity.

16. Defendant Stephanie Casta is an individual residing in the state of Utah who was at all relevant times a Procurement Policy Board member of Defendant Utah Division of Purchasing and General Services. She is sued in her individual capacity.

17. Defendant Standard Wellness Utah, LLC ("Standard Wellness") is a limited liability company doing business in the state of Utah with its principle place of business located in Gibsonburg Ohio. Standard Wellness conspired with the other Defendants, including state officials, to deprive JLPR of its federally protected rights.

6

18. Defendant True North of Utah, LLC ("True North") is a limited liability company doing business in the state of Utah with its principle place of business located in Corinne Utah. True North conspired with the other Defendants, including state officials, to deprive JLPR of its federally protected rights.

19. With respect to all facts and violations alleged in this complaint, each of Defendants acted under color of state law and conspired with other Defendants to deprive JLPR of its constitutional rights.

## JURISDICTION AND VENUE

20. This Court has jurisdiction pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1367 as Plaintiff brings federal claims arising under the United States Constitution.  This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) over this civil action commenced to (i) redress the deprivation of a right or privilege secured by an Act of Congress providing for equal rights of all citizens, and (ii) to secure equitable relief under an Act of Congress providing for the protection of civil rights.

21. The Court also has jurisdiction over this matter under 42 U.S.C. 1983 and 1985, as the Defendants and each of them conspired and acted under the color of law to deprive Plaintiff of its federally protected constitutional rights.

22. This Court has supplemental jurisdiction of Plaintiff's state law claims.

23. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to these claims occurred in this district, the Plaintiff resides in this district and the State and agency Defendants maintain their offices in this district.

24. Venue is also proper as specifically authorized by Utah Code 63G-7-502.

7

## FACTUAL BACKGROUND

25. In November of 2018 Utah voters approved the Utah Medical Cannabis Act (AKA Proposition 2).

26. On November 30, 2018, Governor Gary Herbert formally called for a special session for the Utah State Legislature to make changes to Proposition 2 and on December 3, 2018, the Legislature passed, and the Governor signed, House Bill 3001 (the Utah Medical Cannabis Act) into law. This bill provided for "the cultivation, processing, medical recommendation, and patient use of medical cannabis" within the State of Utah.

27. In June of 2019, the State of Utah opened up an application process for licenses to cultivate medical marijuana within the state of Utah (Solicitation #DB199063).

28. The law at the time provided for up to ten licenses for facilities to cultivate medical marijuana within the state.[1]

29. The limitation on the number of licenses renders them extremely valuable. Indeed, shortly after acquiring its cultivation license, successful applicant Tryke was sold to Cresco Labs, a Chicago based company. On information and belief, this sale was in millions of dollars.

30. Discrepancies between successful applicant Harvest of Utah's Ownership Disclosure Form in its Application and a subsequent press release by the

---

[1] After JLPR was improperly denied a license and after JPLPR filed an appeal with the Utah Court of Appeals (and at the urging of the DAF), the State Legislature amended House Bill 3001 when the Utah Senate passed SB1002 on September 16, 2019 to provide for only up to 8 cultivation licenses and to deny the right to an appeal of any license denial.

company, indicate that it was not truthful about its actual ownership in its
application.

31. JLPR's four owners at that time collectively had over 150 years of successful
business experience. This experience includes owning, operating, and managing
scientifically intensive and heavily regulated businesses, including: a large brine
shrimp operation on the Great Salt Lake for the last twenty-five years; large scale
ranching, restaurant and hospitality businesses in Utah; Hemp CBD formulation
and marketing with specialists in Colorado and other states; and operating a Utah
based railroad. JLPR's owners have significant experience in soil, land, water,
and wildlife habitat remediation. They also have experience in health
management, greenhouses, gardens, pasture food, and medicine production.

32. JLPR and its owners have significant earned capital. JLPR can fully self-finance
all cannabis operations including land and other resources necessary to cultivate
medical cannabis without relying on third-parties. JLPR also has access to world
class experts, including world-renown soil experts, engineers, greenhouse
designers, experienced growers of various medical cannabis strains, scientists,
doctors and many other top experts. JLPR can provide the best locations and
capital support for state-of-the-art facilities. JLPR has access to the best strains of
cannabis to treat the specific medicinal needs of Utahns while creating the most
positive impact on land and all people involved from production to consumption.

33. With this wealth of knowledge and resources, JLPR was and is perfectly suited
for Utah's medical cannabis needs.

34. JLPR timely applied for a Medical Cannabis Cultivator License from DAF.

9

35. The DAF Evaluation Committee determined that JLPR's application met the mandatory requirements for a full review in the technical criteria evaluation stage.

36. However, due to significant problems and flaws with the review process, DAF did not select JLPR for a license.

37. The eight companies who were awarded licenses were: Dragonfly Greenhouse, Harvest of Utah, Oakbridge Greenhouses, Standard Wellness Utah, True North of Utah, Tryke Companies Utah, Wholesome Ag., and Zion Cultivars.

38. A comparison of JLPR's qualifications with those of the successful applicants demonstrates that JLPR was and is more qualified and should have been selected over some of the successful applicants.

39. JLPR timely filed a formal protest of the application process and the decision on July 26, 2019.   Five days later, on July 31, 2019 the DAF's Protest Officer, Christopher W. Hughes, dismissed each issue raised by JLPR in the formal protest.  JLPR appealed the decision to the Procurement Policy Board of Defendant the Utah Division of Purchasing and General Services.  The Procurement Policy Board, consisting of Mark Anderson, Zack Christensen, and Stephanie Casta, sustained the Protest Officer's decision, without a hearing on September 11, 2019.

40. JLPR has appealed this decision to the Utah Court of Appeals, pursuant to the operative statute, which was in effect at the time of the decision and filing of the appeal.  This appeal is was denied on May 13, 2021.

41. As will be detailed below the corruption and other problems in the selection and agency appeal process were a gross violation of JLPR's due process and equal protection rights.

**A. The Former Deputy Commissioner of the DAF Illegally Controlled and Influenced the Selection Process to Favor at Least One Applicant at JLPR's Expense.**

42. Until May 2019, Scott Ericson was Deputy Commissioner of the Department of Agriculture.  In that role, Mr. Erickson spent years developing the State's regulatory framework for medical cannabis.  He wrote the rules, regulations, and application guidelines.  He even wrote the evaluation forms used by the evaluators and the assigned relative weights to each of the criteria used by the evaluators.

43. Mr. Ericson knew all of the evaluators.  He was involved in selecting them personally to be on the evaluation team.  During his time at the department, he supervised many of the evaluators, hired some of them, and personally worked with all of the evaluators.

44. While working for the department of Agriculture, Mr. Ericson traveled across the country meeting with various cannabis growers and state officials.  One of the companies that he became acquainted with was Standard Wellness of Ohio.  While Mr. Ericson was still Deputy Commissioner, he introduced Standard Wellness of Ohio to the Commissioners of Box Elder County in order to acquire land for cannabis cultivation.

45. Standard purchased the land before Mr. Ericson wrote their application and before it was publicly known that out of state companies would be allowed to apply for cultivation licenses.

46. Mr. Ericson formed his consulting company, Utah CBD Pros, while still employed by Department of Agriculture.

47. At some point, either before or immediately after Mr. Ericson left the department, Standard Wellness hired Mr. Ericson to help it secure a cultivation license. Mr. Ericson left the Department at the end May of 2019. Yet somehow, he was able to complete a winning application of hundreds of pages for Standard Wellness by July 1st.

48. During the application process, Mr. Ericson emailed evaluator Cody James, an employee of the Department who Mr. Ericson was involved in selecting as an evaluator. In that email Mr. Ericson informed Mr. James that Mr. Ericson was working on behalf of Standard Wellness. Therefore, at least one evaluator knew that Mr. Ericson was working for Standard Wellness.

49. Despite the fact that Mr. Ericson was hired as a consultant and even had direct communication with the evaluation committee on behalf of Standard Wellness, Mr. Ericson's name is not mentioned among the consultants in Standard Wellness's application.

50. On information and belief, Mr. Ericson continues to work with Standard Wellness.

51. Mr. Ericson's application for Standard Wellness was successful.

12

52. On information and belief, Standard Wellness's application was successful, as were those several of the other selected applicants, due to score collusion and adjustments made by DAF evaluators and management.  This scheme to collude on scores and adjust scores to align with senior DAF management to select favored applicants will be detailed more fully below.

53. As promised, Standard Wellness paid Mr. Ericson approximately $100,000.00 as a success fee.

B. **The Solicitation Process was, Rushed, Requirements were Changed During the Process to Favor Certain Candidates, and the Process was Biased and Anticompetitive**.

54. The Utah Department of Agriculture allowed less than a month (from the June 5th public hearing to the July 1st Deadline) for qualified applicants to gather, assemble, prepare, and present documents and information and to answer technical questions in a complete application that would fairly represent the qualifications of the applicants.

55. This process did not involve interviews, phone calls, or other methods whereby the evaluation committee or the conducting procurement unity could fairly and competently evaluate the applicants.

56. With an adequate amount of time, JLPR would have been able to demonstrate that it was more qualified and would have received perfect or near perfect scores on each of the criteria.  JLPR did not receive fair and proper communication and was denied the ability to dialogue with the application administration.

57. JLPR was not given the opportunity to meet with anyone in advance or during the application and evaluation process in order to ask questions and receive assistance

about how to clearly present their qualifications, despite the fact that these opportunities were afforded to many of the awarded licensees.

58. For example, documents obtained by JLPR through its GRAMA request demonstrate that least one applicant was told that the department would not require companies to post the $250,000.00 bond that was required by the Solicitation and which JLPR posted.

59. Likewise, some of the applicants did not have land to grow on, even though its was required, but the Department decided to be flexible on that requirement.

60. The lack of proper vetting and transparency, including the lack of interviews, meetings, and financial reviews, which should have been part of a meaningful selection process, significantly diminished and disabled JLPR and the State's ability to properly select licensees.

61. Likewise, the sudden change allowing ownership by foreign companies created confusion among the applicants.

62. At the beginning of the application process, all applicants were required to be residents of the State of Utah. JLPR was carefully structured, and its application was specifically prepared to account for the in-state ownership requirement.

63. On June 30th, at the very end of the process, the Department of Agriculture suddenly changed this requirement without adequate notice to the in state applicants, and without allowing time for applicants to revise their applications or adapt to the change. Indeed, the change was not publicly announced until around July 11th. This is notwithstanding the fact that evaluators were discussing how to remove the residency requirement as early as May 17, 2019.

64. The applicants were confused as to who they could or could not include as owners or participants in the companies or consultants for their companies. This confusion and change created an advantage for out of state companies who were not forced to limit their owners and experience to residents of Utah, who by virtue of the law would necessarily have less experience in cultivating cannabis. This disadvantage rendered the process anticompetitive and disadvantaged and discriminated against Utah residents.

65. With an adequate amount of time to adapt its application to the Department's change in this rule, JLPR could have also included experienced out of state parties in its application to meet, or more likely, exceed the experience of the out of state applicants.

66. Of the 80+ applicants, roughly 73 had only in-state owners and roughly 8 included out-of-state owners. Yet, of the 8 applicants awarded medical cannabis cultivation establishment permit, only 4 of the 73 (5%) in-state applicants received a license, while 4 of the 8 (50%) out-of-state applicants received a license.

67. A bias toward out-of-state applicants is obvious on the face of the selection.

68. Furthermore, the fact that the change allowing companies owned by out of state owners was not publicly announced until around July 11th—10 days after the applications were due—means that these out of state applicants must have been given some sort of advanced notice about the rule change. This is especially likely considering the speed with which many of the out of state applicants were able to compile applications and conduct the necessary background checks, etc. It

15

would be almost impossible—not to mention, pointless—to have completed all this work otherwise. This is rendered all the more likely, in light of the conflicts of interest between DAF evaluators and management, which will be discussed below.

69. Successful applicant Standard Wellness of Ohio had already met with Deputy Commissioner Ericson and the Commissioners of Box Elder County to acquire land for cannabis cultivation before the announcement. Indeed, Standard purchased the land before the change to allow out of state applicants was even announced, which is further evidence that out of state companies had been "tipped off" about the change allowing out of state companies before it was made.

70. The selection process, wherein six evaluators, were expected to review and analyze more than 80 applications, most around or in excess of 100 pages, within a two-week period, was rushed and incomplete. This resulted in the Evaluators being forced to use shortcut disqualifiers to quickly select the favored applicants.

71. Furthermore, all of the evaluators were Department of Agriculture employees and hand-picked by the Department heads and there is no indication that the evaluation team was particularly qualified for the task.

72. With this rushed two-week review of 80 complicated, lengthy applications, the selection process was almost guaranteed to be error filled. The application process was antithetical to the notion of vetting and selecting the most qualified applicants, rather than those with political connections. The rushed evaluation period meant that the applicants were not adequately and properly evaluated.

73. These flaws also rendered the selection process anti-competitive.  Because candidates were not given adequate time to present representative and complete applications and were not given the opportunity to adapt to the last-minute ownership change the competition was not fair or objective.

74. The rushed process also led to several clear errors that can be seen in inconsistent scoring, unfairly weighted criteria, and disqualification minimums, including scoring practices that directly violated the governing statute.  The Department of Agriculture did not follow the statutory procedure.  Instead, they set minimum arbitrary scores which the applicants must achieve for sections relating to the business plan and operating plan.   This is contrary to the statute.

C. **The DAF Failed to Correctly Apply the Scoring Criteria and Made Errors Made in the Evaluation Process**.

75. The operative statute provides that an applicant is "eligible for a license under this section if the applicant submits to the department" an application that includes the listed information and complies with the listed criteria, including submitting a business plan and operating plan that comply with requirements of Section 4-41a-204 and Section 4-41a-406.[2]  *See* Utah Code Ann. § 4-41a-201 (2)(b)(iii) (effective December 3, 2018 to September 22, 2019).

76. In the event that there were more qualified applicants than the available permits, the statute provided that:

---

[2] As the Procurement Board noted, JLPR's application was determined by the DAF Evaluation Committee to meet the mandatory requirements to move on to the technical criteria evaluation stage.

(3) If there are more qualified applicants than the number of available licenses for cannabis cultivation facilities under Subsections (1) and (2), the department shall evaluate the applicants and award the limited number of licenses described in Subsections (1) and (2) to the applicants that best demonstrate:

    (a) experience with establishing and successfully operating a business that involves:

        (i) complying with a regulatory environment;

        (ii) tracking inventory; and

        (iii) training, evaluating, and monitoring employees;

(b) an operating plan that will best ensure the safety and security of patrons and the community;

(c) positive connections to the local community; and

(d) the extent to which the applicant can reduce the cost to patients of cannabis in a medicinal dosage form or cannabis products in a medicinal dosage form.

Utah Code Ann. § 4-41a-205 (West) (Effective December 3, 2018 to September 22, 2019).

    77. The Department of Agriculture did not follow this procedure. Instead, they set minimum arbitrary scores which the applicants must achieve for sections relating to the business plan and operating plan. This is contrary to the statute, which required that only after applicants are deemed qualified would the department then evaluate which "applicants that best demonstrate… an operating plan that will best ensure the safety and security of patrons and the community."

    78. The Procurement Board noted that JLPR's application was determined by the DAF Evaluation Committee to meet the mandatory requirements to move on to the technical criteria evaluation stage. However, contrary to the statute, JLPR was still somehow disqualified under these criteria by being given a score below the minimum required 525 for Business Plan Questions 19-20.

79. Examining the DAF's Award Justification Statement, there is no indication that the threshold scores were at all tied to whether or not the Business Plan or Operating Plan complied with Section 4-41a-204 and Section 4-41a-406.  Instead, it was up to the individual evaluators to disqualify companies based on their subjective evaluation of which "applicants that best demonstrate… an operating plan that will best ensure the safety and security of patrons and the community."  This allowed evaluators to quickly disqualify otherwise qualified companies.

80. Furthermore, the evaluators heavily weighted community involvement to the point of it practically being a disqualifying criterion, making the category tied for second place as the most heavily weighted factor. Indeed, from the scores themselves, this factor appears to be dispositive. The eight applicants selected had the eight highest scores on this category.[3]

81. There is no clear reason for applicants to think this factor would be weighted so heavily.  This allowed evaluators the ability to quickly disqualify otherwise qualified companies.

82. The DAF's counterintuitive and illegal scoring system allowed the former DAF Deputy Commissioner, Scott Ericson, who knew how the scoring would be done, to be in a position to advise his client, successful applicant Standard Wellness, to

---

[3] The lowest score on this category by a successful applicant (True North of Utah, LLC) is tied with one unsuccessful applicant.

focus on the "community involvement" aspect, giving Standard Wellness an unfair advantage from this insider information.

83. And, not surprisingly, Standard Wellness's Application devoted a substantial amount of space to a very detailed "Community Engagement Plan," touting a host of initiatives that Standard promised it would be involved in.

84. Furthermore, in its request for proposals, the State said licenses would be given to companies "that best demonstrate experience with establishing and successfully operating a business that involves: complying with a regulatory environment; tracking inventory; and training, evaluating, and monitoring employees." However, the Evaluators clearly did not investigate this criterion because several of the successful applicants had demonstrated that they are not qualified for licenses.

85. For example, Dragonfly Greenhouse did not incorporate until July 24, 2019, *__after__* it received a cultivation permit.  Why the evaluators did not check to determine if the corporation even existed when the Department of Agriculture issued a permit is unclear.

86. Standard Wellness was ranked # 2 by the Evaluators.  However, shortly before time of selection, Standard had to recall product in Ohio because it was contaminated with what turned out to be a pathogenic fungus, Aspergillus. This fact was reported in the news media, which the evaluators either were aware of or should have been aware of.

87. As publicized in the Salt Lake Tribune, the purported parent company of successful applicant Harvest of Utah has faced accusations of fraud in at least two

other states where it operates.  In the months leading up to the Utah solicitation, Harvest was in regulatory hot water in Pennsylvania for allegedly misrepresenting its business to win more permits than it was allowed there. Pennsylvania's Department of Health ended up revoking two of Harvest's dispensary permits.

88. The Ohio Board of Pharmacy opened a separate inquiry into Harvest in early July 2019 (when the Utah applications were being evaluated) on suspicion that it had made false claims about being owned by an economically disadvantaged group in an attempt to win an advantage on its dispensary application, according to The Cincinnati Enquirer.

89. The State of Ohio suspended Harvest's cultivation license and the Ohio Board of Pharmacy halted the opening of any Harvest dispensaries pending resolution of the probe.  These investigations began and were publicized in newspapers before the state Department of Agriculture and Food announced it was granting Harvest of Utah a cultivation permit. Yet somehow Harvest was ranked #1 by the Utah Department of Agriculture Evaluators.

90. The Department of Agriculture's #1 ranking of Harvest brings into question the good faith and validity of the entire selection process.

**C.    The DAF Evaluators and Management Lacked Independence and Illegally Colluded in Scoring to Select Favored Applicants**

91. The DAF's improper and illegal scoring practices have now been confirmed by the State Auditor.

92. The official Audit of DAF records noted serious problems with the evaluation scoring under the headers "Significant Score Correlation Could Indicate Lack of

21

Scoring Independence" and "Significant Modifications to Scores Aligned with

Senior Management Preferences."

93. The report noted that "[t]wo committee members' initial (raw) scores (the Former

Director and the Deputy) were highly correlated."

94. The Auditors conducted a statistical analysis of these evaluator scores which

determined that "the likelihood of this type of score correlation occurring by

chance is less than 5%."    Based on this highly unlikely probability and the

problems with the Department's control environment, the Auditor concluded that

"it appears that the correlation of scores between certain UDAF evaluation

committee members could indicate scoring collaboration."

95. This problem was further exacerbated by the fact that evaluator's scores were

changed after the fact to conform more closely with those of senior management.

The Audit observes:

96. It appears that the UDAF evaluation committee required resolution of significant
differences in raw scores among committee members. No significant adjustments
were made to the Former Director's or the Deputy's raw scores. However,
significant adjustments were made to the raw score of other UDAF staff serving
as committee members, resulting in their final scores being more aligned with
those of senior management.

97. The Report notes that "the bias in favor of senior management preferences are

considered unusual and could indicate an attempt by senior management to

influence other evaluation committee members."

98. The failure of the evaluators to follow the statute in weighing the factors and the

fact that the community involvement category was weighted so heavily as to be

practically dispositive allowed senior management to control who the licenses

22

went to (in violation of the statute) and caused JLPR to be improperly denied a cultivation license. The Auditor's analysis further confirms how this improper scoring scheme was carried out.

99. The then Commissioner also directly influenced three scores to ensure the success of three applicants.

100.     Notwithstanding these clear and incriminating findings in the Auditor's Report, the State of Utah and Department of Agriculture have done nothing to remedy, correct or address the wrongdoings and corrections described above.

101.     This illegal collusion in scoring and score alteration resulted in JLPR being improperly denied a cultivation license.

**The Procurement Board and Evaluators had Numerous Serious Conflicts of Interest.**

102.     Utah law requires that "the procurement unit shall ensure that the evaluation committee … does not have a conflict of interest with any of the offerors." Utah Code 63G-6a-707. Likewise, Utah Code 67-16-7 requires "a public employee who is an . . .owner of any business entity that is subject to the regulation of the agency by which the … public employee is employed shall disclose any position held in the entity."

103.     The evaluators and procurement board members did not act in accordance with the law in failing to take the proper measures to prevent improper conflicts, failing to disclose a variety of improper conflicts, failing to recuse themselves in spite of a variety of improper conflicts, and benefiting favored applicants in line with these conflicts.

104.    The Auditor's Report found that the "UDAF lacked effective procedures to ensure employees properly filed conflict of interest disclosures" and noted several "[c]oncerns that arose due to evaluators' actual and potential conflicts of interests" which were not disclosed.

105.    The Auditor also confirmed and determined that there was improper communication between evaluators and other department personnel and successful applicants. The Report calls out one specific visit, and concluded that "[a]n evaluation committee member should not have contacted or visited Applicant A during the cannabis grower license award process."

106.    Indeed, as publicized in the press, Department Commissioner Kerry Gibson was shown in a photograph meeting with Mike Standlee and Bill Stevens of successful applicant True North of Utah during the application process opened.

107.    Another conflict discussed by the Auditor was the fact that "Prior to the Former Director's employment at UDAF, [the Former Director's] PR Firm represented an individual who subsequently became a principal of" one of the successful applicants.  Nevertheless "[t]he Former Director asserted that she had no conflicts of interest, and the possible conflict of interest was undisclosed." The Auditor determined that that this constituted "[n]on-compliance with the disclosure requirement" and that such failure to discloses the conflict impaired transparency of the process.

108.    This failure was particularly egregious, as the Auditor noted because not

only did this former director continue to work for her PR firm while employed an

DAF, but failed to disclose this fact. The Audit found that:

109.    Neither the Former Director nor the Former PIO provided any written
notice of outside employment nor other outside activities. Each should have filed
conflict of interest disclosures. Upon hire, UDAF did not request disclosure of
any conflicts of interest. In October 2019, both employees were made aware of
the requirement, and were specifically prompted to provide adequate disclosure
documentation, but they did not.

110.    The Auditor also discovered that "[t]he former Director of the Medical

Cannabis and Hemp Programs had been a part-owner of an industrial hemp

company, but sold his interest in the company shortly before his employment at

UDAF." The auditor concluded that "the recent ownership of the business should

have been disclosed but was not." This former director also had ownership in

Cannabis companies in several states.

111.    In addition to the conflicts detailed in the Audit, there were numerous

other conflicts involving evaluators and DAF management (business, church,

family, neighbor, and political) which were not disclosed or recused of, and

which impacted the selection outcome and resulted in JLPR's application being

improperly denied

112.    For example, Kelly Pehrson (former Deputy Commissioner and an

Evaluator for the solicitation) has personal connections with principals of

successful Zion Cultivators, LLC, which secured a cultivation license. Mr.

Pehrson did not recuse himself or disclose the connection.

113.    On May 23, 2019, State Contract Analyst David Bundy, wrote an email

to the evaluators stating that "you cannot disclose specific information about the

RFP with vendors. We have to ensure that this is a fair and equitable process and that no vendor has a leg up on the process." Mr. Bundy further advised "If you may have communicated specifics about the RFP to a vendor already, it may be best for you not to participate in the evaluation committee since this is such a high profile solicitation." However, Evaluators did coach successful applicants without recusing themselves.

114.    As previously mentioned, Mr. Ericson emailed evaluator Cody James, an employee of the Department who Mr. Ericson knew and may have selected as an evaluator. In that email Mr. Ericson informed Mr. James that he was working on behalf of Standard Wellness. But that was not the only prohibited contact by successful applicants.

115.    Zack Kerr, of successful applicant Zion Cultivators, and Evaluator Cody James exchanged emails during the application process. Cody James provided information helpful to the Zion Cultivators application. Yet, despite the instructions of David Bundy, Mr. James did not recuse himself from the evaluation committee.

116.    In another example, Andrew Rigby, the chair of the evaluation committee, told attorneys at Parsons Behle & Latimer (who represented successful applicant Wholesale Ag) that, contrary to the requirements of the Medical Marijuana statute, no bond would be required for Wholesale Ag. Contrary to the instructions of David Bundy, Mr. Rigby did not recuse himself from the evaluation committee

117.    Serious conflicts of interest were also present among the Procurement

Board Members, who heard and denied JLPR's protest appeal at Defendant The

Division of Purchasing.

118.    One of the three procurement board members, Mark Anderson, is a

partner in the law firm Fabian VanCott.  Fabian VanCott represents two of the

successful applicants.

119.    Fabian VanCott is the registered agent for Tryke Companies Utah, LLC,

one of successful applicants.

120.    It appears that Fabian VanCott drafted the corporate documents for

Tryke.

121.    In addition, Fabian VanCott also represents successful applicant

Dragonfly Greenhouse.  The Fabian Law firm is listed as a consultant on

Dragonfly Greenhouse's application, which JLPR obtained through a GRAMA

request.

122.    Despite these clear conflicts of interest, Mr. Anderson did not recuse

himself from the three-member Procurement Board when it heard and denied

JLPR's protest appeal (and the appeal of three other unsuccessful applicants).

123.    In sum, most the companies who were awarded these extremely valuable

licenses were connected in some way to their the evaluators or DAF or Division

of Purchasing personnel and management. Of the eight companies which were

awarded licenses, JLPR has uncovered seven with inappropriate or, at least,

questionable connections.

124.     Rather than selecting truly capable and qualified companies to

successfully operate an emerging Utah cannabis market company, politically

connected companies were selected.

125.     This biased in the selection process, directly resulting from improper

connections, has harmed Utah patients, violated the law, and violated JLPR's due

process and equal protection rights resulting in damages and continued harm to

JLPR.

126.     In December of 2020, the DAF summarily renewed all eight cultivation

licenses in spite of the fact that several of these licensees had proven themselves

unable to meet the production levels promised by them and desperately needed

by Utah patients and despite the fact that many of the licensees demonstrated

failures to follow the law and significant security problems.

**E. JLPR's Protest and Appeals Were Improperly Denied**

127.     The protest appeal and Procurement Board decisions were clearly

erroneous because the panel ignored the issues raised by JLPR in its

Formal Protest Letter Utah and Appeal Letter to the Procurement Board.

The entire discussion of the merits of the appeal consists of only two

single short paragraphs and concludes, without analysis, support, or

discussion that "JLPR failed to provide any facts or evidence in support of

its claims" and accepting the Protest Officer's decision that he "found no

evidence of the evaluation committee violating the Utah Procurement

Code or failing to follow a provision of the Solicitation in its

proceedings."

28

128.    The Panel simply ignored the evidence and facts provided by JLPR which were included in the record.

129.    The Protest Officer and Procurement Board's decisions wherein they flailed to even consider the evidence presented by JLPR, especially in light of the undisclosed and unrecused conflicts of interest described above, were a violation of JLPR's due process and equal protection rights.

130.    These violations have harmed and continue to harm JLPR in an amount according to proof.

131.    JLPR submitted a Notice of Claim to Defendants DAF, the Utah Division of Purchasing and General Services, and the State of Utah on July 21, 2020 apprising these Defendants of JLPR's claims, issues, and essential facts alleged in this Complaint.  Defendants DAF, the Utah Division of Purchasing and General Services, and the State of Utah to took no action to rectify these problems or address JLPR's claims.

## FIRST CAUSE OF ACTION
### Due Process Under the United States Constitution
**(Against Defendants: Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, State of Utah, Kerry Gibson, Kelly Person, Andrew Rigby, Cody James, Natalie Callahan, Mellissa Urie, Brady Grace, Mark Anderson, Zac Christensen, Stephanie Casta, and Christopher W. Hughes)**

132.    Plaintiffs realleges all allegations of this Complaint as if fully set out herein.

133.    By all of the above, Defendants, and each of them, are improperly denying Plaintiff the statutory rights to a fair application process and review to which Plaintiff is entitled. Defendants are also denying Plaintiff a medical cannabis

cultivation licenses despite its satisfaction of the objective criteria showing that Plaintiff should have been awarded a license.

134.    These acts are and were willful on the part of each of the Defendants.

135.    As a result, Plaintiff is being deprived of property rights without due process of law and lacks an effective remedy.

136.    Plaintiff has been and continues to be injured as a direct and proximate result in an amount according to proof.

137.    Plaintiff is entitled to a fair and impartial evaluation of its application that complies with the all legal requirements, which would result in a license.

## SECOND CAUSE OF ACTION
### Due Process Under the Utah State Constitution
**(Against Defendants: Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, State of Utah, Kerry Gibson, Kelly Person, Andrew Rigby, Cody James, Natalie Callahan, Mellissa Urie, Brady Grace, Mark Anderson, Zac Christensen, Stephanie Casta, and Christopher W. Hughes)**

138.    Plaintiffs realleges all allegations of this Complaint as if fully set out herein.

139.    By all of the above, Defendants, and each of them, are improperly denying Plaintiff the statutory rights to a fair application process and review to which Plaintiff is entitled. Defendants are also denying Plaintiff a medical cannabis cultivation licenses despite its satisfaction of the objective criteria showing that Plaintiff should have been awarded a license.

140.    These acts are and were willful on the part of each of the Defendants.

141.    As a result, Plaintiff is being deprived of property rights without due process of law and lacks an effective remedy.

142.     Plaintiff has been and continues to be injured as a direct and proximate result in an amount according to proof.

143.     Plaintiff is entitled to a fair and impartial evaluation of its application that complies with the all legal requirements, which would result in a license.

## THIRD CAUSE OF ACTION
### Denial of Access to Courts under the Utah Constitution
**(Against Defendants: Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, State of Utah)**

144.     Plaintiffs realleges all allegations of this Complaint as if fully set out herein.

145.     By limiting the number of licenses to eight while JLPR was in the process appealing its improper denial, Defendants intended to deprive the Utah Court of Appeals and intended and still intend to deprive this Court of the ability to provide relief for any violation.

146.     Even though the law at the time of the solicitation provided for the selection of up to ten licensees, the DAF only selected its eight preferred applicants.

147.     After JLPR filed its formal protest and immediately after JLPR filed an appeal of the denials of this protest to the Utah Court of Appel, the State of Utah, through the legislature and at the urging of the DAF changed the law to provide a maximum of eight licenses and to prohibit any appeals.

148.     This was done in retaliation for JLPR's protest and appeal and for the specific goal of wrongfully denying JLPR any remedy at law for Defendants' wrongful and illegal conduct.

149.     If Plaintiff proves violations by Defendants and that JPLR was wrongfully denied a cultivation license, the Defendants will contend that no licenses remain to be awarded because all eight permitted licensees are still held by the eight favored original licensees (who still maintain their licenses in spite of failures to produce adequate and promised suply and other problems).  Defendants will contend that the DAF is legally limited to only awarding up to eight licenses and, therefore, that this Court may lack power to grant relief.

150.     Indeed, the Department and the Division of Purchasing have already argued in briefing before the Utah Court of Appeals that there is no available remedy or ability for Plaintiff to be awarded the license it is entitled to on the grounds of these *post hoc* amendments.

151.     By all of the above, Defendants, and each of them, are depriving Plaintiff of access to court.

152.     Plaintiff has been and continues injured as a direct and proximate result in an amount according to proof.

153.     To remedy at least part of Plaintiff's injuries, the Court should issue the injunctive relief demanded below.

## <u>FOURTH CAUSE OF ACTION</u>
### Equal Protection Under the United States Constitution
**(Against Defendants: Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, State of Utah, Kerry Gibson, Kelly Person, Andrew Rigby, Cody James, Natalie Callahan, Mellissa Urie, Brady Grace, Mark Anderson, Zac Christensen, Stephanie Casta, and Christopher W. Hughes)**

154.     Plaintiff realleges all allegations of this Complaint as if fully set out herein.

155.      Plaintiff in this action was treated differently than other similarly situated applicants in that those other applicants were provided, communication and information during the application process whereas Plaintiff was not.

156.      Had Plaintiffs been given the same communication, information, and same opportunities, Plaintiff would have been awarded a cultivation license.

157.      In addition, applicants who were less qualified than Plaintiff were awarded licenses over Plaintiff due, not to merit, but as a direct result of conflicts of interest, cronyism, favoritism, corruption, and failures to follow the statutory guidelines, all in violation of the law.

158.      These acts are and were willful on the part of each of the Defendants and were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's constitutional rights.

159.      In addition, the DAF and Procurement Board improperly denied JLPR's protest and appeal when they rendered decisions which were arbitrary and capricious and failed to consider the evidence.

160.      By acting as described above, Defendants subjected Plaintiff to irrational and wholly arbitrary treatment.

**<u>FIFTH CAUSE OF ACTION</u>**
**Equal Protection Under the Utah State Constitution**
**(Against Defendants: Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, State of Utah, Kerry Gibson, Kelly Person, Andrew Rigby, Cody James, Natalie Callahan, Mellissa Urie, Brady Grace, Mark Anderson, Zac Christensen, Stephanie Casta, and Christopher W. Hughes)**

161.    Plaintiff realleges all allegations of this Complaint as if fully set out herein.

162.    Plaintiff in this action was treated differently than other similarly situated applicants in that those other applicants were provided, communication and information during the application process whereas Plaintiff was not.

163.    Had Plaintiffs been given the same communication, information, and same opportunities, Plaintiff would have been awarded a cultivation license.

164.    In addition, applicants who were less qualified than Plaintiff were awarded licenses over Plaintiff due, not to merit, but as a direct result of conflicts of interest, cronyism, favoritism, corruption, and failures to follow the statutory guidelines, all in violation of the law.

165.    These acts are and were willful on the part of each of the Defendants and were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's constitutional rights.

166.    In addition, the DAF and Procurement Board improperly denied JLPR's protest and appeal when they rendered decisions which were arbitrary and capricious and failed to consider the evidence.

167.    By acting as described above, Defendants subjected Plaintiff to irrational and wholly arbitrary treatment.

168.    This disparate treatment is unjustified.

169.    Plaintiff in this is victim of "class of one" equal protection violations in that there is no rational basis for the disparate treatment.

170.     In addition, the DAF discriminated against Plaintiff on the basis of it being a Utah resident, favoring out of state applicants.  This violated Plaintiff's right to equal protection under the Constitution.

171.     Plaintiff has been and continues to be damaged by Defendants' violations in an amount according to proof.

### FOURTH CAUSE OF ACTION
### Violation of Utah Code § 4-41a-205
**(Against Defendants: Utah Department of Agriculture and Food, State of Utah, Kerry Gibson, Kelly Person, Andrew Rigby, Cody James, Natalie Callahan, Mellissa Urie, and Brady Grace)**

172.     Plaintiff realleges all allegations of this Complaint as if fully set out herein.

173.     The operative statute provides that an applicant is "eligible for a license under this section if the applicant submits to the department" an application that includes the listed information and complies with the listed criteria, including submitting a business plan and operating plan that comply with requirements of Section 4-41a-204 and Section 4-41a-406.  *See* Utah Code Ann. § 4-41a-201 (2)(b)(iii) (effective December 3, 2018 to September 22, 2019).  In the event that there were more qualified applicants than the available permits, the statute provided that:

(3) If there are more qualified applicants than the number of available licenses for cannabis cultivation facilities under Subsections (1) and (2), the department shall evaluate the applicants and award the limited number of licenses described in Subsections (1) and (2) to the applicants that best demonstrate:
    (a) experience with establishing and successfully operating a business that involves:
        (i) complying with a regulatory environment;
        (ii) tracking inventory; and
        (iii) training, evaluating, and monitoring employees;

(b) an operating plan that will best ensure the safety and security of patrons and the community;
(c) positive connections to the local community; and
(d) the extent to which the applicant can reduce the cost to patients of cannabis in a medicinal dosage form or cannabis products in a medicinal dosage form.

Utah Code Ann. § 4-41a-205 (West) (Effective December 3, 2018 to September 22, 2019).

174.    The Department of Agriculture did not follow this procedure. Instead, it set minimum arbitrary scores which the applicants must achieve for sections relating to the business plan and operating plan. This is contrary to the statue which required that only after applicants are deemed qualified would the department then evaluate which "applicants that best demonstrate… an operating plan that will best ensure the safety and security of patrons and the community."

175.    The DAF acted contrary to the law by failing to correctly apply the scoring criteria and by colluding and changing scores to favor preferred applicants who were connected to DAF personnel.

176.    These acts are and were willful on the part of each of the Defendants and were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's constitutional rights. The Division of Purchasing and State have ratified this failure to follow the law.

177.    Plaintiff has been and continues to be damaged by Defendants' violations in an amount according to proof.

178.     Plaintiff is entitled to an injunction correcting this failure as prayed

for below.

### FIFTH CAUSE OF ACTION
**Violation of Utah Code 67-16-1, et seq. And 63G-6a-707**
**(Against Defendants: Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, State of Utah, Kerry Gibson, Kelly Person, Andrew Rigby, Cody James, Natalie Callahan, Mellissa Urie, Brady Grace, Mark Anderson)**

179.     Plaintiff realleges all allegations of this Complaint as if fully set out

herein.

180.     Defendants violated the law by failing to disclose the conflicts of interest

described above, failing to recuse themselves from decision making affecting

JLPR where these conflicts of interest existed, and by making decisions and

taking actions which improperly favored applicants with which Defendants had

conflicts of interests concerning.

181.     These acts are and were willful on the part of each of the Defendants and

were intentional, malicious, willful, wanton, obdurate, and in gross and reckless

disregard of Plaintiff's constitutional rights. JLPR was directly harmed and

continues to be harmed by this failure in an amount according to proof.

### SIXTH CAUSE OF ACTION
**Civil Conspiracy**
**(Against all Defendants)**

182.     Plaintiff realleges all allegations of this Complaint as if fully set out

herein.

183.     The unlawful and overt acts described above were committed in

furtherance of a common design, intention, or purpose by each of the Defendants.

184.    Specifically, there was a meeting of the mind between each of the Defendants with at least one other Defendant to accomplish the object of assuring that certain favored applicants receive cultivation licenses and to thereby deprive JLPR of obtaining a cultivation license.

185.    Defendants Ericson and Standard Wellness agreed with various persons at the DAF around May or June of 2019 to ensure that Standard Wellness would illegally obtain a cultivation license.

186.    Defendant True North agreed with various persons at the DAF around May or June of 2019 to ensure that their companies would illegally obtain a cultivation license.

187.    The Defendants who were employed by the DAF each agreed amongst themselves around May or June of 2019 to ensure that certain companies would illegally obtain a cultivation license.

188.    To accomplish these ends, the conspiring Defendants agreed to and engaged in numerous unlawful, overt acts. These include: The former Deputy Commissioner of the Department of Agriculture Standard Wellness and Scott Ericson illegally communicating with Department of Agriculture Evaluators to ensure that Standard Wellness obtained a license;  Mr. Ericson, the Department of Agriculture, and the Evaluators setting up and applying a *sub rosa* system of evaluation contrary to statute that would ensure the selection of Standard Wellness; The Evaluators and Department of Agriculture Management setting up and applying a *sub rosa* system of evaluation contrary to statute each colluding in scoring to ensure the selection of favored applicants; Evaluators improperly

38

communicating with applicants during the evaluation process; Evaluators and

Procurement Board member Mark Anderson failing to disclose conflicts of

interest with successful applicants while rendering decisions favoring their

client/conflicts and which were detrimental to Plaintiff; the other members of the

Procurement Board ratifying and acquiescing to the acts of Mr. Anderson when

they joined in with him in denying Plaintiff's Protest Appeal, in spite of this clear

conflict of interest; Department Commissioner Kerry Gibson meeting with a

successful applicant during the application process; among others.

189.    JLPR has been damaged as a proximate result in an amount according to

proof.

## SIXTH CAUSE OF ACTION
### Declaratory Relief
**(Against Defendants: Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, State of Utah)**

190.    Plaintiff realleges all allegations of this Complaint as if fully set out

herein.

191.    Based on the allegations contained in this Complaint, there is a present

and actual need for a judicial declaration declaring that Utah Code § 4-41a-205

(and related) are either unconstitutional or were applied unconstitutionally as to

JLPR.

## SEVENTH CAUSE OF ACTION
### Injunctive Relief
**(Against Defendants: Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, State of Utah)**

192.    Plaintiff realleges all allegations of this Complaint as if fully set out

herein.

193.     Defendants are engaged in violations of law and violations of Plaintiff's rights as described above.  Plaintiff is entitled to an injunction requiring Defendants Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, and the State of Utah to award Plaintiff a medical cannabis cultivation license.

194.     In the alternative, Plaintiff is entitled to an order enjoining Defendants Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, and the State of Utah from offering any new licenses or renewing any licenses without first providing a license to JLPR.

195.     Plaintiff has no other remedy at law and irreparable harm will result if this injunctive relief is not granted. The requested injunctive relief will not be adverse to the public interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff JLPR respectfully request the following relief:

A.     An injunction requiring Defendants Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, and the State of Utah to award Plaintiff a medical cannabis cultivation license;

B.     In the alternative, an order enjoining Defendants Utah Department of Agriculture and Food, the Utah Division of Purchasing and General Services, and the State of Utah from offering any new licenses or renewing any licenses without first providing a license to JLPR;

C.     Damages in an amount according to proof, including but not limited JLPR's lost profits, out of pocket costs, attorneys' fees, consultant fees

D.    JLPR's attorneys' fees and costs; and

E.    Such other relief as the Court may deem just and equitable.

## **<u>JURY DEMAND</u>**

Plaintiff hereby requests a trial by jury on issues so triable by right.

DATED this 19th day of July, 2021.

PRICE PARKINSON & KERR, PLLC

<u>/s/ Jason M. Kerr</u>
Jason M. Kerr
Attorney for Plaintiff

41